BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Chief, National Security Division
AMANDA B. ELBOGEN (Cal. Bar No. 332505)
Assistant United States Attorney
National Security Division
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorney
Transnational Organized Crime Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3667/5748/0813
    Facsimile: (213) 894-0141
    E-mail:    ian.yanniello@usdoj.gov
               amanda.elbogen@usdoj.gov
               daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 25-1022-MWF-4 |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT TINA LAI'S APPLICATION FOR REVIEW/RECONSIDERATION OF DETENTION ORDER; DECLARATION OF AMANDA B. ELBOGEN; EXHIBIT A |
| v. | |
| TINA LAI, aka "Kickwhere," | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Ian V. Yanniello, Amanda B. Elbogen, and Daniel H. Weiner, hereby submits the government's opposition to defendant TINA LAI's application for review/reconsideration of this Court's detention order. (Dkt. 24.)

    The government's response is based on the below memorandum of points and authorities, the declaration of Amanda B. Elbogen; Exhibit A, the files and records in this case, including the materials

proffered in support of the government's request for detention, and such further argument and evidence as may be presented to the Court.

Dated: February 27, 2026            Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

         /s/   *Amanda B. Elbogen*
IAN V. YANNIELLO
AMANDA B. ELBOGEN
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant TINA LAI was ordered detained by this Court based on flight risk and danger.  That was for good reason.  This is a terrorism case involving a bombing plot to use improvised explosive devices ("IEDs") to attack at least five buildings in Southern California on New Year's Eve.  Over the course of several weeks, the co-conspirators methodically planned their New Year's Eve attack: they selected targets; designed explosive devices; acquired bomb-making components; and then traveled to the desert to build and test their IEDs.

As set forth below, defendant was integral to the plot.  For example, in furtherance of the co-conspirators' plan to build and detonate test explosives in the desert, defendant purchased and brought material to create bomb fuses and PVC pipes to house the explosives.  Soon after arriving to the desert, defendant started cleaning the interior of the PVC pipes as her co-conspirators began preparing the mix to create combustible black powder.  Evidence seized from defendant's cellphone --- including step-by-step plans to manufacture other explosives --- further support her continued dangerousness if released on bond.

The facts before the Court also prove defendant is a significant flight risk.  The strength of the evidence against defendant, including recordings showing defendant's active participation in the bomb plot, and the significant custodial sentence she will face if convicted, create significant incentive to flee prosecution.

Given the obvious danger of releasing defendant on bond, there are no conditions of release that can adequately mitigate the risk to

community safety or the risk of non-appearance.  Defendant should remain detained pending trial.

**II.   BACKGROUND**

    **A.   Defendant and Her Co-Conspirators Are Arrested After Trying to Assemble Bombs in the Desert on December 12, 2025**

On December 12, 2025, defendant and three co-conspirators --- AUDREY ILLEENE CARROLL also known as ("aka") "Asiginaak," ("CARROLL"), ZACHARY AARON PAGE aka "AK" ("PAGE"), and DANTE GAFFIELD aka "Nomad" ("GAFFIELD") -- traveled to the Mojave desert to construct and test IEDs in furtherance of their New Year's Eve attack plan.  (Complaint, Dkt. 1, ¶ 6.)  As the co-conspirators took steps to assemble the bombs, the FBI intervened and arrested the defendants.  (Id.)  The following day, the government obtained a criminal complaint charging the defendants with violations of 18 U.S.C. § 371 (Conspiracy) (Count One); and 26 U.S.C. § 5861(d) (Possession of Unregistered Destructive Device) (Count Two).  On December 23, 2025, the government indicted defendant and her co-conspirators on charges of Providing and Attempting to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Counts Two-Five), and Possession of an Unregistered Destructive Device, in violation of 26 U.S.C. § 5861(d) (Count Seven).  Co-defendants CARROLL and PAGE were also indicted on charges of Conspiracy to Use a Weapon of Mass Destruction in violation of 18 U.S.C. § 2332a (Count One).

**B.   The Desert Bomb Testing Was Part of the Co-Conspirators' Plan to Blow Up Multiple U.S. Businesses on New Years' Eve, December 31, 2025**

As set forth in the complaint, in late November 2025, CARROLL, a member of the Turtle Island Liberation Front ("TILF"),[1] provided a Confidential Human Source ("CHS") an eight-page, handwritten document titled "OPERATION MIDNIGHT SUN" that described a bombing plot. Another TILF member known as "AK," who was later identified as PAGE, was also present during the meeting. (Complaint, Dkt. 1, ¶ 5.)

The bombing plan was detailed and calculated. Specifically, the plan contemplated planting backpacks with "ieds," or Improvised Explosive Devices, to be simultaneously detonated at five or more locations in the Southern California targeting two U.S. companies at midnight on New Year's Eve 2025. (Id.) The handwritten plan stated the "ieds" would be "complex pipe bombs," included instructions on how to manufacture the bombs, and included guidance to avoid leaving evidence behind that could be traced back to the co-conspirators. CARROLL also discussed with the CHS the prospect of testing the explosives "in the desert" in mid-December 2025. (Id.)

Since the initial meeting where the bomb plot was discussed, CARROLL and PAGE recruited other co-conspirators to the plot, including defendant[2] and GAFFIELD. (Id., ¶ 6.) On or about December 7, 2025, the CHS and an undercover law enforcement officer ("UCE") met with defendant, CARROLL, and PAGE. CARROLL stated she had "the

---

[1] According to open-source information and other evidence gathered during the investigation, TILF is an anti-capitalist, anti-government, anti-Israel movement that advocates for violence against United States officials. (Complaint, ¶¶ 8-9.)

[2] As set forth below, CARROLL first informed defendant about the specifics of the bombing plot while the co-conspirators drove to the desert on December 12, 2025.

plan" and handed it to GAFFIELD, which he and the UCE both reviewed. (Id., ¶ 17(a).)  Following GAFFIELD's review of the attack plans, CARROLL asked him whether some of his "comrades" would be on his team.  GAFFIELD responded by confirming he would see if others were interested in participating in the plot.  (Id., ¶ 17(b).)  The conspirators then discussed the operation, including other co-conspirators who would participate in the attack and bomb-making components that CARROLL had already acquired.  (Id., ¶ 17(c)-(f).)  During the meeting, the conspirators also discussed obtaining guns, seeking firearms training, and plans for future attacks after the New Year's Eve bombings, namely, plans to commence targeting U.S. Immigration and Customs Enforcement ("ICE") agents and vehicles with pipe bombs beginning in January or February 2026, with CARROLL noting "that would take some of them out and scare the rest of them."  (Id., ¶ 17(g)-(i).)

### C. Defendant and Her Co-Conspirators Use an Encrypted Messaging Application to Further The Bombing Plot

The conspirators, including defendant, CARROLL, PAGE, and GAFFIELD, used a messaging group on the Signal application titled "Order of the Black Lotus" to further the bombing plot.  For example, on December 5, 2025, CARROLL wrote that the Black Lotus Signal group was "our group for everything radical[.]" (Id., ¶ 18.)

Among other things, the co-conspirators used the Black Lotus group chat to discuss the bombing plot, including their plan to test explosive devices in the Mojave desert on or about December 12, 2025.  Specifically, on or about December 5, 2025, CARROLL forwarded instructions to the CHS for the desert explosive testing that were originally posted in the Black Lotus group by PAGE.  The instructions

4

included geocoordinates for the planned camp site, which correspond to a location in the Mojave Desert, specifically the Lucerne Valley, California.  The instructions included a screenshot of a satellite map with markings depicting "where we will set up camp (C on the map above) and where we will test (T on the map above)."  (Id.)

PAGE instructed the group that they will only have two burner phones to use in case of emergencies and for directions on the way out.  Once everyone arrived, their phones would be put in a small cardboard box completely sealed with aluminum in an effort to further conceal their activities from law enforcement.  That same day, GAFFIELD confirmed "I have a few burners / But im saving for the big event / The big party [celebrate emoji]."  (Id.)

To prepare for building bombs in the desert, defendant told her co-conspirators that she would bring large PVC pipes and discussed various materials to use for the bomb fuses.  For example, in response to CARROLL asking the group "someone's getting the wider diameter pvc too right? I have 13 of the 1 inch / 2.5 cm diameter already cut," defendant responded: "Yeah I need to get that. Can you remind me what diameter I need to bring?" CARROLL responded, "3, 4, or 5 inch" and "maybe a small amount of each if you can find some."  As noted above, defendant purchased the PVC pipes and brought them with her to the desert.  Additionally, in a conversation about what kind of material to bring for the bomb fuses, defendant sent photos of multiple types of material the co-conspirators could use.

**D.   The Co-Conspirators Travel to the Desert to Test Their IEDs**

As discussed above, on December 12, 2025, defendant, CARROLL, PAGE, and GAFFIELD traveled to the Mojave desert in two vehicles for the purpose of building and testing IEDs.  Defendant drove one

5

vehicle with CARROLL and the CHS as passengers.  On the way to the desert, defendant learned the details of the New Years' Eve plot and continued driving her co-conspirators to the desert in furtherance of the bombing plan.

After the conspirators arrived at the desert, they began setting up a campsite, including tents and table.  CARROLL, PAGE, and defendant all brought bomb-making components to the campsite, including various sizes of PVC pipes, suspected potassium nitrate, charcoal, charcoal powder, sulfur powder, and material to be used as fuses, among others.  Some of those bomb-making components are depicted in the photographs below:

 

Shortly after the conspirators began transferring the precursors and other bomb-making components from their vehicles to the campsite, CARROLL, PAGE, and defendant began setting up the bomb-making materials on a table.  GAFFIELD and others set up a tent behind the table to keep the bomb-making materials and the group shaded from the

6

1 sun.  The conspirators also took out a bag of charcoal and prepared
2 to start grinding one of the precursor powders that would be used to
3 create an explosive black powder.  As depicted in the photographs
4 below, defendant began to prepare a large PVC pipe to use as the
5 shell for an IED.



After the UCE alerted law enforcement with a pre-determined signal indicating that bomb testing was imminent, FBI personnel intervened and placed defendant, CARROLL, PAGE, and GAFFIELD into custody.

**E.  Evidence Obtained From the Defendant's Phone Shows Defendant's Motive to Use Violence to Further the Co-Conspirators' Goals**

Although law enforcement continues to search defendant's phone pursuant to a federal warrant, there has already been significant evidence found that further proves defendant's violent intent.  For example, defendant's phone contained (i) additional bomb-making instructions, including step-by-step instructions to build a cluster bomb (redacted pictured below);[3] (ii) photographs documenting instructions to build Molotov cocktails;[4] (iii) TILF materials advocating for violence;[5] and (iv) text messages where defendant LAI discussed violent "direct action" and "burn[ing] the ship," even if that entailed "actions that may not be fine in the eyes of the law."[6]



---

[3] Elbogen Decl., Ex. A at 51.

[4] Ex. A at 34.

[5] For example, defendant had multiple TILF documents titled "Peaceful Protest Will Never Be Enough" and "Take Up Arms and Join the Resistance," which stated in red letters: "Violent resistance is necessary. We must take up arms."  Ex. A at 9-13, 37-50.

[6] Ex. A at 4, 5 and 8.

8

Defendant also had screenshots of training materials that included directions on how to "slash or punch," noting, "Remember that stabs are lethal but take time, while cuts usually hurt and distract or blind."[7]

### F. The Court Orders Defendant Detained

On December 15, 2025, defendant had her initial appearance and detention hearing before the Honorable Maria A. Audero, United States Magistrate Judge, who ordered defendant detained pending trial on danger and flight. (Dkt. 24.)

### G. Defendant Seeks to Reopen Her Detention Hearing

On February 12, 2026, defendant filed an application for reconsideration of the Court's order of detention. (Dkt. 68.) On February 26, 2026, defendant filed a memorandum in support of her request for pretrial release on bond, seeking to be released to her family home pending trial, and proposed bond in the amount of $1 million secured by a family member's home. (Dkt. 75.)

## III. ARGUMENT

This Court's conclusion at defendant's detention hearing remains the correct one: pretrial detention is both appropriate and necessary in this case. Defendant is both a grave danger to the community and a substantial risk of non-appearance. Either basis is sufficient for this Court to permanently detain defendant pending trial.

### A. Legal Standard

This Court's review of the release order is de novo. United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990). While the "district court is not required to start over . . . and proceed as if

---

[7] Ex. A at 17-33.

the magistrate's decision and findings did not exist," the district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." Id. at 1193. In support of that task, a district court may hold additional evidentiary hearings, if the court concludes such hearings would be helpful. Id.

The Bail Reform Act requires pretrial detention of a defendant where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a flight risk or a danger to the community; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). The government must establish flight risk "by a preponderance of the evidence," United States v. Santos-Flores, 794 F.3d 1088, 1090 (9th Cir. 2015), or dangerousness "by clear and convincing evidence," United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008). Four factors govern the analysis of whether release conditions will reasonably assure a defendant's appearance and the community's safety: (1) the nature and circumstances of the offense, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger that would be posed by the defendant's release. 18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).

**B. Defendant Presents an Extraordinary Danger to the Community**

The seriousness and danger of defendant's offense is clear. Defendant conspired with others to build IEDs and use them to attack multiple U.S. businesses. Few crimes present this level of danger

10

and utter disregard for human life.  The dangerousness of defendant based on her conduct in this case alone is more than sufficient to support detention.

Defendant was a core member of the bombing plot.  She took numerous steps toward building the bombs, and prepared to detonate them in the desert knowing full well that this was part of a larger plan to detonate bombs at locations in the Los Angeles area on New Years' Eve.  She purchased PVC pipes, sawed them down to the correct sizes, brought those with her to the desert, and then started wiping down the pipes as her co-conspirators prepared the explosive black powder.  She also brought the bomb fuse materials.

Evidence seized from defendant's phone further shows her commitment to use violence to achieve TILF's anti-government goals. Her phone contained screenshots of training materials that noted, "Remember that stabs are lethal but take time, while cuts usually hurt and distract or blind."  She possessed detailed instructions for creating other explosives, including "cluster bombs" and "Molotov cocktails."  Other evidence from her phone shows that defendant and her co-conspirators planned to use the weapons.  See, e.g., Ex. A at 9-13, 37-50 (TILF-related material noting, among other things, "Violent resistance is necessary. We must take up arms"); id. at 4, 5 and 8 (text communications showing defendant was willing to "burn the ship" and take "actions that may not be fine in the eyes of the law.").

Notably, defendant's proposed bond package does not mitigate her danger to the community in any way.  As the record in this case makes clear, the co-conspirators --- including unindicted co-conspirators who have not yet been charged --- went to great lengths to conceal

11

their criminal conduct and intent: they used encrypted communication applications with disappearing messages; they met in person to discuss the specifics of the bombing plot; they researched law enforcement tactics and even discussed operational security measures such as wearing disguises and creating fake alibis.[8]  In short, there are no conditions of release that can monitor or stop defendant from reengaging with other co-conspirators to plot more violence --- or obstruct justice.

Defendant's continued detention is clearly necessary to protect the community.

### C. Defendant Presents a Substantial Flight Risk

The weight of the evidence against defendant (including audio and video evidence of her violent intentions and admissions), and the potentially lifelong custodial sentence she will face if convicted, support a conclusion that defendant poses a risk of non-appearance. See Townsend, 897 F.2d at 995; Santos-Flores, 794 F.3d at 1092 (recognizing that the defendant posed a flight risk because of, among other reasons, "the severity of the potential punishment and the weight of the evidence against him").

\*   \*   \*

When there is "no condition or combination of conditions" that can adequately address the risk of danger or flight in this case, detention is appropriate.  See 18 U.S.C. § 3142 (e)(1).  Given all of the foregoing --- the serious charges related to defendant's bombing plot, defendant's clear intention to carry out the attack, and the

---

[8] For example, as part of the co-conspirators' plot, they discussed creating a fake alibi during the bombings by leaving their cellular phones at home while instructing another person to actively use the device.

12

substantial consequences that are likely to follow --- there are no conditions or combination of conditions to adequately protect the community or prevent defendant's flight from prosecution.

## IV. CONCLUSION

For the foregoing reasons, the Court should order that defendant remain detained pending trial.

**DECLARATION OF AMANDA B. ELBOGEN**

I, Amanda B. Elbogen, declare as follows:

1. I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I am one of the attorneys assigned to the case United States v. Lai, 2:25-cr-1022-MWF-4.

2. On February 26, 2026, Federal Bureau of Investigation ("FBI") Special Agent Alicia Ceroni sent me a document containing a Forensic Examination Report generated using Axiom software, which included items law enforcement agents had "tagged" as "of interest" from the defendant's phone, which was seized by law enforcement pursuant to a federal search warrant on December 12, 2025.

3. Exhibit A is a true and correct copy of excerpts from the Axiom report generated by law enforcement agents after conducting an initial review of defendant's phone. These excerpts include several pictures defendant had stored on her phone, direct messages defendant sent and received using electronic messaging applications, and examples of defendant's web search history on the day of her arrest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California on February 27, 2026.

/s/
Amanda B. Elbogen